UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------

WEBSTER BANK, NATIONAL ASSOCIATION,

Plaintiff,

-against-

WIPRO GALLAGHER SOLUTIONS, INC. and WIPRO
LIMITED,

Defendants.

-------------------------------------------------------------------------

Index No.  1:15-CV-0731 (LEK/RFT)

**COMPLAINT AND
JURY DEMAND**

Plaintiff Webster Bank, National Association ("Webster Bank"), by its attorneys Dorf &
Nelson LLP, for its Complaint against Defendant Wipro Gallagher Solutions, Inc. and Wipro
Limited (collectively, "WGS"), upon knowledge to Plaintiff's own actions and upon information
and belief as to the actions of all others, alleges as follows:

<u>PRELIMINARY STATEMENT</u>

1.     This action is brought by Plaintiff Webster Bank to recover losses that it has
suffered as a result of Defendant WGS's failure to deliver a loan origination system called
NetOxygen (the "NetOxygen System") and provide services to Plaintiff that Defendant was
contractually required to provide pursuant to a Master Services Agreement, dated May 9, 2013
(the "MSA") and Statements of Work, dated May 9, 2013, June 7, 2013, and two dated June 11,
2013,  that the parties agreed upon pursuant to the MSA ("SOWs").  By failing to deliver and
implement the NetOxygen System and provide related services to Webster Bank, WGS breached
the terms and conditions of the MSA and the SOWs.

1

2.     Defendant WGS was also grossly negligent and engaged in willful misconduct. Specifically, WGS made material misrepresentations and omissions about WGS's ability to meet Webster Bank's requirements during the bidding process to win Webster Bank's business over its competitors; knowingly understaffed and mismanaged the project; made ongoing misrepresentations to Webster Bank that WGS would be able to meet definitive time constraints and deliver a working loan origination system to Webster Bank during the period of June 7 to November 1, 2013 in time for Webster Bank to use to originate loans in compliance with new federal regulations effective January 1, 2014; and abandoning the project entirely to address the needs of other clients.  In this regard, WGS intentionally prolonged the process during which time it took personnel assigned to Webster Bank's project and redeployed such personnel to other projects presumably because they were more lucrative to WGS.  Ultimately, this course of conduct on the part of WGS resulted in what was tantamount to a total abandonment of Webster Bank's project.  Such behavior and actions on the part of WGS caused further damage to Webster Bank.

3.     Defendant WGS also repeatedly represented to Plaintiff Webster Bank that it would be able to provide the NetOxygen System and agreed-upon services for a fixed price. Nonetheless, when WGS began to fall behind on schedule and was unable to meet its obligations to Webster Bank, WGS began to demand exorbitant payments on top of agreed-upon fixed prices for the NetOxygen System and services as set forth in the MSA and SOW entered into by the parties pursuant to the MSA.  Webster Bank refused to make these additional payments demanded by WGS.

4.     As a result of WGS' failure to timely deliver and install the NetOxygen System, Webster Bank had to scramble to put its own loan origination platform in place to ensure that

there would not be any business interruption to Webster Bank's lending operations and therefore substantial revenue loss if it could not comply with new federal laws and lending regulations effective January 2014.

5.     To date, Plaintiff Webster Bank paid $542,203.37 to Defendant WGS for the NetOxygen System and services that Defendant WGS was contractually obligated to provide to Webster Bank pursuant to the MSA and SOWs. Despite Webster Bank's demands, Defendant WGS has refused to complete the project at agreed-upon fixed rates. WGS has also refused to refund Webster Bank's payments despite WGS's obligation to do so pursuant to Webster Bank's rights under the terms of the MSA and the SOWs including, but not limited to, Webster Bank's right to reject the NetOxygen System and services provided by WGS. To date, Defendant WGS has failed to deliver a working loan origination system to Plaintiff.

6.     As a result of WGS's misconduct, Webster Bank was also forced to incur unforeseen costs and damages. Among other things, when WGS failed to deliver and implement the NetOxygen System by the agreed-upon date, Webster Bank was potentially in danger of being unable to continue its loan origination business in accordance with new federal regulations and lending laws starting on January 1, 2014. The costs and damages incurred by Plaintiff in connection with Wipro's conduct, including fruitless efforts to implement their system and substantially modifying Plaintiff's own legacy loan origination system included, but were not limited to, substantial time investments made by the IT Department, Compliance, Project Management Office Group, Line of Business Management Group, Line of Business Testers, Loan Servicing Group, Executives and the Legal Department for a total of 12,368 hours amounting to internal costs of $1,109,105.00, plus costs and damages.

7.     In total, Webster Bank has suffered damages in the amount of $1,651,308.37.

## PARTIES

8.     Plaintiff Webster Bank, National Association is a federally chartered national bank association with its principal place of business at Webster Plaza, 123 Bank Street, PB805-2, Waterbury, Connecticut 06702.

9.     Defendant Wipro Gallagher Solutions, Inc. is a Florida corporation with its principal place of business at 18001 Old Cutler Road, Suite 651, Palmetto Bay, Florida 33157.

10.     Defendant Wipro Limited is a company organized under the laws of the Republic of India with a business address of Survey #76P & #80P, Doddakanahalli Village, Varthur Hobli Sarjapur Road, Bangalore, Karnataka K7 560035.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this matter under 28 U.S.C. § 1332, based upon diversity of citizenship among the parties.  This matter exceeds, exclusive of interests and costs, the sum of $75,000.00.

12.     Venue is properly laid in the United States District Court for the Northern District of New York pursuant to 28 U.S.C. §§ 1391(a)(2), (b)(1) and (2).

## FACTUAL BACKGROUND

### A.  WGS Bids on a Project To Provide Loan Origination System to Webster Bank.

13.     Plaintiff Webster Bank is a regional bank with a physical presence in New York, Connecticut, Massachusetts and Rhode Island that provides financial services to individuals, families and businesses throughout the United States.

14.     In or about early 2013, Plaintiff solicited bids from various providers of information technology services, including WGS, for a project to provide Webster Bank with a

4

loan origination platform and the necessary accompanying support services. Companies that chose to bid on the project were required to complete a written request for proposal for the loan origination platform affirming that they met all requirements set by Webster Bank for the project.

15.     In or about March, 2013, WGS bid on the project to provide Webster Bank with a loan origination platform and the necessary accompanying support services. WGS completed and submitted a request for proposal to Webster Bank (the "WGS Bid").

16.     In the written WGS Bid and in other communications with Webster Bank during the bid process, WGS made numerous representations of present, material facts in order to win the bidding process for the business of building a loan origination platform for Webster Bank.

17.     Defendant WGS represented that it satisfied all of Webster Bank's requirements for the project including, but not limited to, that it had the capability to create a loan origination platform for Webster Bank in advance of new federal rules and regulations for loan origination that would go into effect as of January 1, 2014.   Among other things, WGS provided a written "Statement of Work" and an "Implementation Plan" to Webster Bank during the bidding process in which it made numerous representations about its capabilities to timely provide Webster Bank with a loan origination system that would suit its needs in advance of the regulatory changes going into effect on January 1, 2014.

18.     Defendant WGS also represented that it would be able to provide a loan origination system with functionalities required by Webster Bank.

19.     Defendant WGS also represented that it could deliver a loan origination system at specified, fixed costs. Among other things, WGS provided Webster Bank with pricing sheets for specified aspects of the loan origination system and rate cards which provided the rates for

specified roles of WGS employees such as architects, project managers, and developers.

20.     Defendant WGS also represented that it had provided similar services to large banks such as JPMorgan Chase, U.S. Bank Home Mortgage, and Northwest Savings Bank.

21.     Defendant WGS also represented that it its principals and key personnel of WGS would personally provide the services Webster Bank was contracting for.   These persons included: (i) Narayan Bharadwaj, CEO ("Bharadwaj"); (ii) Teresa Blake, Practice Director, Lending Solutions; (iii) Pete Lefebvre, Head, Operations; (iv) Joey McDuffee, Head, Sales; and (v) Kimberley Moore, Head of Project Management.

22.     Defendant WGS also represented that it would provide Plaintiff with comprehensive support services.   These services included a dedicated support person to be on site at Webster Bank to assist with questions or issues and a toll-free technical support hotline. Defendant represented that it would provide Webster Bank with "24 hour technical support" "seven days a week" and that its' Technical Support Department would be staffed by "personnel who have a combination of technical and mortgage-specific (business) backgrounds."  According to Defendant WGS, it maintained all "development issues in Tracker" which was "our own developed issue-tracking software" and that it would review "reports on outstanding issues daily to assure timely progress towards completion."

23.     Defendant WGS also represented that there were no lawsuits or other legal proceedings pending against the company relating to any of the materials or services that were a part of the proposal and that it had no customer complaints in the prior four years.   WGS also provided numerous due diligence files including audited financial statements.

24.     The foregoing representations were made to Webster Bank representatives by the CEO of Wipro Gallagher Solutions, Inc., Bharadwaj, and others at WGS.

25.     Plaintiff Webster Bank reasonably relied upon all of the representations made by Defendant WGS during the bidding process.  Ultimately, the WGS Bid was accepted by Webster Bank over bids by other providers.

26.     Defendant WGS' representations and omissions to Plaintiff Webster Bank during the bidding process were false and were made by WGS with the intent to induce Webster Bank to act upon them by awarding WGS a lucrative business opportunity to build a loan origination system for Webster Bank instead of its competitors.

**B. WGS and Webster Bank Enter Into a Master Services Agreement.**

27.     On May 9, 2013, Plaintiff Webster Bank entered into a Master Services Agreement with Defendant WGS as "Provider" (referred to herein as the "MSA").  The MSA was executed by Bharadwaj as "General Manager & Business Head."

28.     Pursuant to the MSA, Defendant WGS was required to deliver a loan origination platform, called the "NetOxygen System," and provide agreed-upon services in exchange for fees by an agreed-upon "Transition Completion Date."

29.     As represented by WGS, the NetOxygen System would include software that would enable Webster Bank to originate, process, underwrite, close and fund loans.  The NetOxygen System would also include standard Uniform Residential Loan Application, Truth-in-Lending, Good Faith Estimate, and Mortgage Program Disclosure calculations for industry standard loan programs.

30.     The MSA provided the general terms pursuant to which Defendant WGS was required to provide software and services comprising its NetOxygen System to Plaintiff Webster Bank.  (MSA, § 2.2.)  Webster Bank and WGS would then "enter into separate [Statements of Work or] SOWs" "duly authorized by representatives of [Webster Bank] and [WGS as]

Provider" for deliverables and services.  (Id.)  The SOWs would describe the products, or "deliverables," and/or provide the scope of services to be provided by WGS, the date by which the deliverables and/or services had to be provided by WGS, Plaintiff's remedies for when products were not delivered and/or service levels were not met by WGS, pricing for the deliverables and/or services, and any other terms and conditions relating to the deliverables and/or services.  (Id.)  A form SOW was attached as Exhibit 1 to the MSA.

31.     The MSA provided that SOWs "may be amended and supplemented by written amendments thereto or pursuant to Change Control Procedures."  Section 3.9 of the Master Services Agreement defined a "Changed Circumstance" as "a circumstance in which an event has occurred or is planned with respect to the business of Webster that results or will result in a change in the scope, nature or volume of the Services that will be required from Provider . . . ." (MSA, § 3.9.)

32.     The MSA further provided that Webster Bank would have a minimum of 30 days "to review and test the Deliverable or the results of the Services for compliance with the Specifications."  (MSA § 4.5(a).)  Then, Webster Bank had the option of either accepting or rejected the deliverables or services.  As set forth in the "Failure and Correction" Section of the MSA, "Webster shall accept the Deliverable or Services at such time as (i) Webster, in its sole and reasonable discretion, determines that the Deliverable or Services materially conform to the Specifications, and (ii) Webster confirms to Provider its acceptance of such Deliverable or Services in writing . . ." (Id., § 4.5(b).)

33.     The MSA included "Provider Representations and Warranties."  Among other things, Defendant WGS represented and warranted that "Provider: (i) has, and each of the Provider Personnel that Provider will use to provide and perform the Services has, the necessary

8

knowledge, skills, experience, qualifications, rights and resources to provide and perform the Services in accordance with the Agreement; (ii) will perform the Services in a diligent, professional and workmanlike manner using an appropriate number of trained and qualified individuals, and, at a minimum, in accordance with industry standards applicable to the performance of such Services." (MSA, § 13.2.)

34.     The MSA also included "Provider Covenants." Among other things, Defendant WGS covenanted that "Provider will efficiently use the resources or services necessary to provide the Services and to perform the Services in accordance with the Service Levels, Performance Standards and the Specifications in the most cost-effective manner consistent with the required level of quality and performance and Webster's policies, including budgetary constraints." (MSA, § 14.1.)

35.     The MSA also included terms pursuant to which Webster Bank could terminate the MSA for, inter alia, cause, if the terms of an SOW were breached, if WGS ceased providing services to Webster Bank, and/or for convenience. (MSA, Article 17.)

**C. The Statements of Work and Software License Hosting Agreement.**

36.     On the same day that the MSA was signed, May 9, 2013, Plaintiff Webster Bank and Defendant WGS entered into SOW #1 for "Gap Analysis Sessions" pursuant to the MSA. SOW #1 provided that Defendant WGS would work with Plaintiff to outline and plan the development and implementation of the NetOxygen System, referred to as the "Deliverables," during the scheduled period of May 13 to May 24, 2013. Pursuant to SOW #1, "[t]he fixed price for the delivery of the Services and Deliverables" [was] $5000.00." Defendant WGS was required to "[m]eet the deliverables and expectations in a timely and quality manner" and provide Plaintiff with "daily contact and status updates." SOW#1 was executed by Bharadwaj

on behalf of Defendant.  (SOW #1.)

37.   On or about June 7, 2013, Plaintiff Webster Bank and Defendant WGS entered into SOW #2 and a "Software License Hosting Attachment," both governed by the terms of the MSA.

38.   SOW #2 provided for "Functional Specifications" based upon the "Gap Analysis Sessions" in SOW #1.  Pursuant to SOW#2, WGS was required to provide Webster Bank with the design, setup, configuration and customization of the NetOxygen System during the period of June 6 to July 31, 2013.  The "Deliverables" defined in SOW#2 were planning and scheduling functional design meetings and formal sign-off sessions, providing functional specification for "Setup Data," "Custom Configuration," and "Interface Integration (Customizations)" for the NetOxygen System, and providing "Business Impact Assessment and Compliance Review." Pursuant to SOW #2, "[t]he fixed price for the Services and Deliverables is $76,000.00." Defendant WGS was required to "[m]eet the deliverables and expectations in a timely and quality manner" and provide Plaintiff with "daily contact and status updates."  SOW #2 was executed by Bharadwaj on behalf of Defendant.  (SOW #2.)

39.   The Software License Hosting Attachment executed that same day on June 7, 2013 provided that the NetOxygen System to be provided by Defendant would include the following:

- "B2C (NetOxygen Business-to-Consumer) Portal" which was supposed to allow Webster Bank customers to obtain information about loans and pricing, submit loan applications, monitor their loans, and refer friends online;

- "B2B (NetOxygen Business-to-Business) Portal" which was supposed to

10

enable the registration, pricing, and importation of loans from correspondent lenders; and

- "B2B e.MO (Enterprise Mobile Origination)" solution which was supposed to provide a "lending productivity suite" for mobile devices such as iPads to, among other things, facilitate sales in the field by keeping sales teams informed and connected with customers. WGS represented that the e.MO solution was currently able to facilitate disclosures, credit reporting, and automated valuation models.

40.    As set forth in the Software License Hosting Attachment, Plaintiff would pay a "One-Time License Fee" of $80,000.00 upon execution of the Agreement in addition to "Monthly License Fees" and "Implementation and Training Fees" of $376,000.000.   The Software License Hosting Attachment was executed by Bharadwaj on behalf of Defendant.

41.    On or about June 11, 2013, Plaintiff Webster Bank and Defendant WGS entered into SOW #3 pursuant to the terms of the MSA.  SOW #3 provided for the "construction, testing and delivery" of the NetOxygen System for Plaintiff as determined by the "Functional Specifications" set pursuant to SOW #2.  The "Deliverables" were defined therein as the "Plan and Schedule; Construction and Packing for Setup Data, Configuration and Customization; Testing and Delivery Efforts."   Defendant was required to construct, test and deliver the NetOxygen System during the period of June 7 to November 1, 2013.  Of course, this time frame was specified to ensure that that the NetOxygen System would be up and running in time for Webster Bank to originate loans in compliance with new federal rules and regulations in effect on January 1, 2014.  Pursuant to SOW #3, "[t]he fixed price for the Services and Deliverables is $280,000.00."  Defendant WGS was required to "[m]eet the deliverables and expectations in a

11

timely and quality manner" and provide Plaintiff with "daily contact and status updates." SOW#3 was executed by Bharadwaj on behalf of Defendant. (SOW #3.)

42.    Also, on or about June 11, 2013, Plaintiff Webster Bank and Defendant WGS entered into SOW #4 pursuant to the terms of the MSA. SOW #4 provided for the "Pilot and Rollout Training" of the NetOxygen System as determined by the prior SOWs, defined therein as the "Deliverables." Defendant was required to provide the Deliverables during the period of October 14 to November 1, 2013.  Again, this time frame was specified to ensure that that the NetOxygen System would be up and running in time for Webster Bank to originate loans in compliance with new federal rules and regulations in effect on January 1, 2014.  Pursuant to SOW #4, "[t]he fixed price for the Services and Deliverables is $15,000.00." Defendant WGS was required to "[m]eet the deliverables and expectations in a timely and quality manner" and provide Plaintiff with "daily contact and status updates."  SOW #4 was executed by Bharadwaj on behalf of Defendant. (SOW #4.)

43.    Each of the SOWs contained a provision incorporating Webster Bank's right under the MSA to accept or reject the deliverables and/or services provided pursuant thereto. The provision, entitled, "Acceptance Criteria," states that "[f]ormal acceptance of deliverables identified in Section IV as outlined in Section 4.5 of the MSA."  Additionally, Webster Bank reserved the right to cancel each of the SOWs "before completion should it be determined that the work is no longer needed" with 48 hours of advance notice.

**D.  Wipro Gallagher's Parent Company, Wipro Limited, Guaranteed WGS' Ability to Deliver and Implement the NetOxygen System to Webster Bank.**

44.    Defendant Wipro Limited provided a Parent Guaranty to Webster Bank executed by Viajy Kumar K K as "General Manager WIPRO TECHNOLOGIES (A Division of Wipro

Limited).  As set forth therein:

> **THIS PARENT GUARANTY** ("Guaranty"), dated as of ____ day of May, 2013 of Wipro Limited, a corporation organized and validly existing under the laws [of] India ("Guarantor"), is made in favor of Webster Bank, N.A. ("Webster Bank"), in connection with the following Agreement: (1) the Master Services Agreement, by and between Wipro Gallagher Solutions, Inc. ("Wipro") and Webster Bank, including the Attachment and related Statement of Work (the "Agreement") . . . Pursuant to the Agreement, Wipro has undertaken certain obligations and responsibilities.  Webster Bank would not have entered into the Agreement without Guarantor's agreement to provide a guaranty of Wipro'[s] obligations under the Agreement.  Accordingly, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

> **1.  Guaranty.**  Guarantor hereby absolutely, unconditionally, and irrevocably guarantees to Webster Bank, and its successors and permitted assigns, all and each of the payment obligations of Wipro under the Agreement, including, without limitation, the full and prompt payment when due (whether at stated maturity, declaration, acceleration, demand or otherwise) of all the indebtedness, indemnities, liabilities and other payment obligations of Wipro to Webster Bank under the Agreement (all of the foregoing collectively, the "Obligations").

> **2. Payment Guaranty.**  If Wipro has failed to pay an Oblgiation under any of the Agreement when due, then upon written notice from Webster Bank to Guarantor specifying that Wipro has failed to pay the Obligation, Guarantor shall immediately proceed, pursuant to the terms of the Agreement and this Guaranty, to reimburse Webster Bank for the amounts owed with respect to such Obligation. With respect to any Obligation, this Guaranty is a Guaranty of payment and collection . . .

•  •  •

> **8. Costs and Expenses.**  Guarantor agrees to pay on demand all reasonable costs and expenses of Webster Bank and reasonable fees and disbursements of counsel in connection with the enforcement of, or preservation of any rights under, this Guaranty.

**E. Defendant WGS Fails to Deliver the NetOxygen System and Services Related Thereto to Plaintiff Webster Bank and Plaintiff Webster Bank Terminates the Parties' Agreements.**

45.     As the SOWs make clear, Defendant WGS was obligated to construct, test and

13

deliver the NetOxygen System during the period of June 7 to November 1, 2013. Defendant WGS failed to do so.

46.     Instead, WGS continuously missed agreed-upon deadlines set in the SOWs leading up to November 1, 2013 due to, inter alia, problems with the functionality of the NetOxygen System as it was represented to Webster Bank. The project was also understaffed by WGS and representatives that it assigned to the project did not have the expertise and capabilities represented by WGS.

47.     As the SOWs also make clear, Defendant WGS was obligated to provide the NetOxygen System and related services to Webster Bank at agreed-upon fixed prices. Defendant WGS failed to do so. Instead, the project was plagued by cost-overruns. WGS began to demand that Webster Bank make payments beyond the agreed-upon fixed prices in order to complete and deliver the NetOxygen System.

48.     During this time, WGS and its representatives continued to make material misrepresentations and omissions to Webster Bank about its ability to deliver and implement the NetOxygen System. Webster Bank reasonably relied upon these misrepresentations and omissions to its detriment.

49.     By early fall of 2013, it was obvious that WGS would not be able to construct, test and deliver the NetOxygen System to Webster Bank on time by November 1, 2013 as promised. As a result, Webster Bank was in danger of being unable to originate loans in compliance with new federal rules and regulations that would go into effect on January 1, 2014. Webster Bank therefore was forced to incur substantial costs to come up with work-around solutions so that it could continue its loan origination business in compliance with new federal regulations and lending laws in effect as of January 1, 2014. These internal costs included, but

14

were not limited to, unanticipated time and expense incurred by the IT Department, Compliance personnel, Project Management Office Group, Line of Business Management Group, Line of Business Testers, Loan Servicing Group, Executives and the Legal Department.   In total, Webster Bank spent no less than 12,368 hours at an internal cost of $1,109,105.00 to be in a position to process loans in an inferior manner than what was required to be provided by Wipro.

50.     On or about September 18, 2014, Plaintiff Webster Bank and Defendant WGS met to address WGS's failures to provide the NetOxygen System and related services during agreed-upon timeframes.   At the meeting, Webster Bank demanded that WGS honor the MSA and SOWs and provide the NetOxygen System and related services as soon as possible at the agreed-upon fixed prices.   WGS, however, continued to demand that Webster Bank pay additional, unanticipated compensation to deliver the NetOxygen System to Webster Bank. Webster Bank refused to pay additional costs.

51.     On November 18, 2014, Plaintiff Webster Bank provided Defendants Wipro Gallagher Solutions, Inc. and Wipro Limited with written notice of Webster Bank's termination for cause of the MSA and SOWs pursuant to Article 17 of the MSA (the "Termination Letter"). Webster Bank did not receive a response to the Termination Letter.

52.     On November 18, 2014, Plaintiff Webster Bank also provided Defendants Wipro Gallagher Solutions, Inc. and Wipro Limited with written notice of the existence of a Dispute pursuant to Article 18 of the MSA with respect to the validity, performance, interpretation and/or application of multiple provisions of the MSA, the SOWs, and in general WGS's failure to implement the NetOxygen System and provide related services in accordance with the MSA and SOWs (the "Notice of Dispute").   Webster Bank did not receive a response to the  Notice of Dispute.

53.     On December 12, 2014, Plaintiff Webster Bank again wrote Defendants Wipro Gallagher Solutions, Inc. and Wipro Limited pursuant to Article 18 of the MSA to provide notice that WGS did not respond to the Notice of Dispute and therefore failed to negotiate in good faith in an effort to resolve the dispute pursuant to section 18.2(a) of the MSA.   Webster Bank further gave notice to Defendants Wipro Gallagher Solutions, Inc. and Wipro Limited that pursuant to Section 18.2(b) of the MSA, the dispute should be referred to the Management Committee.

54.     On December 18, 2014, Defendant WGS wrote Webster Bank to acknowledge receipt of the Termination Letter and Notice of Dispute and stated that WGS would be in a position to respond by January 20, 2015.  At no point, however, did WGS either submit a plan to cure its breaches of the MSA and SOWs or engage in good faith negotiations with Webster Bank as required by the MSA and SOWs.  Indeed, WGS' response was wholly inconsistent with the dispute resolution terms set forth in the MSA and therefore indicative of WGS' consistent history of failing to honor contractual commitments to Webster Bank as a whole.

55.     Accordingly, on January 16, 2015, Webster Bank wrote Defendants Wipro Gallagher Solutions, Inc. and Wipro Limited pursuant to Article 18 and requested that the Steering Committee come up with a viable resolution for the Dispute during the Dispute Resolution process.  Defendants Wipro Gallagher Solutions, Inc. and Wipro Limited failed to do so. On January 20, 2015, Peter LeFebvre, General Manager- Client Services, for Wipro Gallagher Solutions, Inc. responded to Webster Bank by simply denying any wrongdoing on its part. Again, Defendants failed to provide any plan to cure its breaches of the MSA and SOWs and did not state that the required steps pursuant to the MSA were taken in an effort to resolve the dispute.

56.     On February 13, 2015, counsel for Webster Bank responded to Mr. LeFebvre's

letter and stated that since the parties' Dispute had not been resolved in 60 days in accordance with Article 18 of the MSA, Webster Bank would be commencing legal action against WGS. Webster Bank further advised WGS that since more than 30 days had passed and WGS had not submitted a written plan to cure its breaches of the MSA and SOW in accordance with Article 17 of the MSA, the MSA and SOWs were terminated.

57.     To date, Plaintiff Webster Bank has paid $542,203.37 to WGS but has not received the promised loan origination platform.  Instead, Webster Bank was forced to incur $1,109,105.00 in costs and expenses in connection with Wipro's conduct, including fruitless efforts to implement their system and substantially modifying Plaintiff's own legacy system in order to put a temporary loan origination system in place before new loan origination rules and regulations went into effect on January 1, 2014.   In total, Webster Bank has been damaged in an amount no less than $1,651,308.37.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION AGAINST DEFENDANT
### WIPRO GALLAGHER SOLUTIONS, INC.

#### (Breach of Contract)

58.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 57 above as if fully set forth herein.

59.     In 2013, on the dates set forth above, Plaintiff Webster Bank and Defendant WGS entered into the MSA, SOW #1, a Software License Hosting Agreement, SOW #2, SOW #3 and SOW #4, all of which are valid and enforceable agreements.

60.     Pursuant to the foregoing agreements, Defendant WGS was required to deliver and

implement the NetOxygen System and related services to Plaintiff Webster Bank.

61.     Defendant WGS has materially breached the agreements by failing to provide the NetOxygen System and related services to Plaintiff Webster Bank. Defendant WGS materially breached the agreements by, inter alia, failing to deliver, implement and test the NetOxygen System by the agreed-upon due date of November 1, 2013.

62.     Defendant WGS materially breached the agreements by, inter alia, failing to deliver, implement and test the NetOxygen System at agreed-upon fixed prices.

63.     Plaintiff Webster Bank has been damaged as a result of Defendant WGS' breaches of the agreements in that it has paid $542,204.37 to WGS to date and not received the agreed-upon goods and services from WGS.

64.     Plaintiff Webster Bank has also been damaged as a result of Defendant WGS' breaches of the agreements in that it incurred additional costs and expenses due to WGS' failure to deliver and implement a loan origination system in time to comply with new federal rules and regulations in effect on January 1, 2014. Webster Bank therefore was forced to incur substantial costs to come up with a work-around so that it could continue its loan origination business in compliance with new federal regulations and lending laws starting on January 1, 2014. These internal costs included, but were not limited to, unanticipated time and expense incurred by the IT Department, Compliance, Project Management Office Group, Line of Business Management Group, Line of Business Testers, Loan Servicing Group, Executives and the Legal Department for a total of 12,368 hours amounting to internal costs of $1,109,105.00.

65.     Plaintiff Webster Bank's total amount of damages as a result of Defendants' breaches of the agreements is no less than $1,651,308.37, plus interest that continues to accrue at the standard rate of nine percent per annum.

## SECOND CAUSE OF ACTION AGAINST
## DEFENDANT WIPRO LIMITED

### (Breach of Contract)

66.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 65 above as if fully set forth herein.

67.     Defendant Wipro Limited is obligated to Plaintiff Webster Bank for Wipro Gallagher Solutions, Inc.'s breaches of the agreements pursuant to the Parent Guaranty that it provided to Plaintiff Webster Bank.

68.     As set forth therein, Defendant Wipro Limited is the Guarantor of Defendant Wipro Gallagher Solutions, Inc.'s obligations and responsibilities to Webster Bank pursuant to the MSA and related SOWs, collectively defined in the Parent Guaranty as the "Agreement." The Parent Guaranty expressly states that: "[Wipro Gallagher Solutions, Inc.] has undertaken certain obligations and responsibilities. Webster Bank would not have entered into the Agreement without Guarantor's agreement to provide a guaranty of [Wipro Gallagher Solutions, Inc.'s] obligations under the Agreement."

69.     Paragraph 1 of the Parent Guaranty, entitled "**Guaranty**," states that Defendant Wipro Limited as Guarantor "hereby absolutely, unconditionally, and irrevocably guarantees to Webster Bank, and its successors and permitted assigns, all and each of the payment obligations of [Wipro Gallagher Solutions, Inc.] under the Agreement, including, without limitation, the full and prompt payment when due (whether at stated maturity, declaration, acceleration, demand or otherwise) of all the indebtedness, indemnities, liabilities and other payment obligations of [Wipro Gallagher Solutions, Inc.] to Webster Bank under the Agreement (all of the foregoing collectively, the "Obligations").

70.     Paragraph 2 of the Parent Guaranty, entitled **"Payment Guaranty,"** states that if Wipro Gallagher Solutions, Inc. "has failed to pay an Obligation under any of the Agreement when due, then upon written notice from Webster Bank to Guarantor specifying that Wipro has failed to pay the Obligation, Guarantor shall immediately proceed, pursuant to the terms of the Agreement and this Guaranty, to reimburse Webster Bank for the amounts owed with respect to such Obligation.   With respect to any Obligation, this Guaranty is a Guaranty of payment and collection . . ."

71.     Paragraph 8 of the Parent Guaranty, entitled **"Costs and Expenses,"** states that Wipro Limited as Guarantor "agrees to pay on demand all reasonable costs and expenses of Webster Bank and reasonable fees and disbursements of counsel in connection with the enforcement of, or in preservation of any rights under, this Guaranty."

72.     Plaintiff Webster Bank has provided written notice to Defendant Wipro Limited that Defendant Wipro Gallagher Solutions, Inc. has failed to refund the amount Plaintiff paid to Defendant Wipro Gallagher Solutions, Inc. pursuant to the MSA and SOWs despite the fact that Plaintiff has terminated the parties' agreements due to Defendant Wipro Gallagher Solutions, Inc.'s failure to comply with the terms thereof and deliver a working loan origination system and services related thereto and failed to refund Plaintiff's costs and expenses incurred as a result thereof.

73.     Defendant Wipro Limited has breached the Parent Guaranty by failing to immediately reimburse Webster Bank for the amounts owed by Defendant Wipro Gallagher Solutions, Inc. and Plaintiff has been damaged as a result.

74.     Plaintiff Webster Bank's total amount of damages as a result of Defendant Wipro Limited's breach of the Parent Guaranty is no less than $1,651,308.37, plus interest that continues to

20

accrue at the standard rate of nine percent per annum.

75. Defendant Wipro Limited is also liable to Plaintiff for "all reasonable costs and expenses" and "reasonable fees and disbursements of counsel" in connection with the enforcement of the Parent Guaranty.

### THIRD CAUSE OF ACTION AGAINST DEFENDANTS
### WIPRO GALLAGHER SOLUTIONS, INC. AND WIPRO LIMITED

#### (Fraudulent Misrepresentations)

76. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 75 above as if fully set forth herein.

77. Defendant WGS made knowing misrepresentations and omissions of present, material facts in order to win the bidding process for the business of building a loan origination platform for Webster Bank. These misrepresentations and omissions by Defendant WGS to Plaintiff Webster Bank included, but were not limited to: (i) that WGS satisfied numerous requirements of Webster Bank for the project including, but not limited to, that it had the capability to create a loan origination platform for Webster Bank in advance of new federal rules and regulations for loan origination that would go into effect as of January 1, 2014; (ii) that WGS would be able to provide a loan origination system with functionalities required by Webster Bank; (iii) that WGS could deliver a loan origination system with the functionalities required by Webster Bank at specified costs; (iv) that WGS had provided similar services to other large banks; (v) that WGS had sufficient resources to deliver and install a loan origination system in time for Webster Bank to meet new federal regulations in effect on January 1, 2014; (vi) that WGS' principals and key personnel would be assigned to and work closely with Webster Bank on the project; (vii) that WGS would be able to provide sufficient project support services to

Plaintiff; and/or (viii) that WGS met all other requirements set forth in Webster Bank's written request for bid proposal. The foregoing representations were made by the CEO of Wipro Gallagher Solutions, Inc., Bharadwaj, and others at WGS.

78.    Defendants' misrepresentations were made with the intent to deceive Plaintiff Webster Bank and induce it award it the business of building a loan origination platform for Webster Bank.

79.    Plaintiff Webster Bank reasonably relied upon all of the representations made by Defendant WGS during the bidding process. Indeed, the WGS Bid was accepted by Webster Bank over bids by other providers.

80.    Defendants' fraudulent misrepresentations and omissions to Plaintiff were outside the scope of the MSA and the SOWs.

81.    As a result of Defendant WGS's fraud, Plaintiff has been damaged in an amount yet undetermined in excess of the jurisdictional limits of this Court but no less than $1,651,308.37 plus interest that continues to accrue at the standard rate of nine percent per annum.

82.    Plaintiff is also entitled to punitive damages against Defendant WGS based upon WGS' wanton, willful and malicious conduct.


## FOURTH CAUSE OF ACTION AGAINST DEFENDANTS
## WIPRO GALLAGHER SOLUTIONS, INC. AND WIPRO LIMITED

### (Willful Misconduct)

83.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 82 above as if fully set forth herein.

84.    As set forth in detail above, Defendant WGS engaged in willful misconduct knowing that its conduct would cause Plaintiff Webster Bank to suffer substantial damages.

85.     Defendant WGS' willful misconduct included, but is not limited to: (i) making material misrepresentations and omissions to Webster Bank during the bidding process about its capability to analyze Plaintiff's business, outline, plan and customize a loan origination platform in accordance with Plaintiff's stated needs; (ii) making material misrepresentations and omissions to Webster Bank during the bidding process about the cost of providing Plaintiff with a customized loan origination platform in accordance with Plaintiff's stated needs (iii) failing to provide agreed-upon deliverables and services in accordance with its representations to Plaintiff; (iv) mismanagement of the project; (v) continuing to make material misrepresentations and omissions to Plaintiff throughout 2013 and through to the end of the year to lull Plaintiff into believing that Defendant WGS would be able to deliver a loan origination system to Plaintiff in advance of new rules and regulations in effect on January 1, 2014 and so that it could continue to collect fees and costs from Plaintiff; (vi) replacing dedicated WGS representatives on the project so that they could be diverted to new, more lucrative projects; (vii) failing to provide a loan origination system in time for Plaintiff to comply with known regulatory reporting requirements; (viii) abandoning the project before scheduled completion and thereby leaving Plaintiff in the lurch and forcing it to scramble to come up with a temporary solution to avoid business interruption and accompanying revenue loss; (ix) failing to provide deliverables and services at fixed costs, resulting in substantial cost-overruns, and trying to shift these overages to Plaintiff upon threat of not completing the project; and/or (x) overselling the NetOxygen System to too many other banks and other businesses such that it was unable to fulfill its known obligations to Plaintiff.

86.     Defendant WGS was aware that its intentional conduct would result in injury or damage to Plaintiff.

87.     As result of Defendant's willful misconduct, Plaintiff has been damaged in an amount yet undetermined in excess of the jurisdictional limits of this Court but no less than $1,651,308.37 plus interest that continues to accrue at the standard rate of nine percent per annum.

88.     Plaintiff is also entitled to punitive damages against Defendant WGS for its wanton, willful and malicious conduct.

## FIFTH CAUSE OF ACTION AGAINST DEFENDANTS
## WIPRO GALLAGHER SOLUTIONS, INC. AND WIPRO LIMITED

### (Gross Negligence)

89.     Plaintiff Webster Bank repeats and realleges the allegations contained in paragraphs 1 through 88 above as if fully set forth herein.

90.     As set forth in detail above, WGS committed intentional acts and omissions knowing that its conduct would cause Plaintiff Webster Bank to suffer substantial damages.

91.     These intentional acts and omissions include, but are not limited to:  (i) making material misrepresentations and omissions to Webster Bank during the bidding process about its capability to analyze Plaintiff's business, outline, plan and customize a loan origination platform in accordance with Plaintiff's stated needs; (ii) making material misrepresentations and omissions to Webster Bank during the bidding process about the cost of providing Plaintiff with a customized loan origination platform in accordance with Plaintiff's stated needs (iii) failing to provide agreed-upon deliverables and services in accordance with its representations to Plaintiff; (iv) mismanagement of the project; (v) continuing to make material misrepresentations and omissions to Plaintiff throughout 2013 and through to the end of the year to lull Plaintiff into believing that Defendant WGS would be able to deliver a loan origination system to Plaintiff in

24

advance of new rules and regulations in effect on January 1, 2014 and so that it could continue to collect fees and costs from Plaintiff; (vi) replacing dedicated WGS representatives on the project so that they could be diverted to new, more lucrative projects; (vii) failing to provide a loan origination system in time for Plaintiff to comply with known regulatory reporting requirements; (viii) abandoning the project before scheduled completion and thereby leaving Plaintiff in the lurch and forcing it to scramble to come up with a temporary solution to avoid business interruption and accompanying revenue loss; and/or (ix) failing to provide deliverables and services at fixed costs, resulting in substantial cost-overruns, and trying to shift these overages to Plaintiff upon threat of not completing the project.

92.     Defendant WGS' intentional acts and omissions also included overselling the NetOxygen System to too many other banks and other businesses such that it was unable to fulfill its known obligations to Plaintiff.

93.     As a result of Defendant's gross negligence, Plaintiff has been damaged in an amount yet undetermined in excess of the jurisdictional limits of this Court but no less than $1,651,308.37 plus interest that continues to accrue at the standard rate of nine percent per annum.

94.     Plaintiff also seeks punitive damages against Defendant WGS for its wanton, willful and malicious conduct.

## JURY TRIAL DEMANDED

95.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Webster Bank, N.A. demands judgment:

A.  On its first claim for breach of contract against Defendant Wipro Gallagher Solutions, Inc., damages in an amount yet undetermined in excess of the jurisdictional limits of this Court but no less than $1,651,308.367, plus interest, costs and fees;

B.  On its second claim for breach of contract against Defendant Wipro Limited damages in an amount yet undetermined in excess of the jurisdictional limits of this Court but no less than $1,651,308.367, plus interest, costs and fees;

C.  On its third claim for fraudulent misrepresentation against Defendants Wipro Gallagher Solutions, Inc. and Wipro Limited damages in an amount yet undetermined in excess of the jurisdictional limits of this Court but no less than $1,651,308.367, plus interest, costs and fees;

D.  On its fourth claim for willful misconduct against Defendants Wipro Gallagher Solutions, Inc. and Wipro Limited damages in an amount yet undetermined in excess of the jurisdictional limits of this Court but no less than $1,651,308.367, plus interest, costs and fees;

E.  On its fifth claim for gross negligence against Defendants Wipro Gallagher Solutions, Inc. and Wipro Limited damages in an amount yet undetermined in excess of the jurisdictional limits of this Court but no less than $1,651,308.367, plus interest, costs and fees; and

F.  such other relief as may be legal, just and proper.

DATED:       Rye, New York
             June 12, 2015

                                    **DORF & NELSON LLP**


                                    Jonathan B. Nelson, Esq. JN-8705
                                    Laura-Michelle Horgan, Esq. LR-7799
                                    Dorf & Nelson LLP
                                    *Attorneys for Plaintiff*
                                    *Webster Bank, National Association*
                                    555 Theodore Fremd Ave.
                                    Rye, NY 10580
                                    Tel: (914) 381-7600
                                    Emails:  jnelson@dorflaw.com
                                             lhorgan@dorflaw.com